So the first matter on for argument today is Jose Luis Eduardo Mendez-Morales v. William Barr, 15-70900. Good morning. Good morning, Your Honors. May it please the court. My name is Gianfranco DeGirolamo for the petitioner. I would like to read a little more into that because we're recording and we'll be able to hear you. My name is Gianfranco DeGirolamo for the petitioner, and I would like to reserve two minutes for rebuttal. The main issue in this case regards the standard for nexus for withholding or removal. And the case was decided by the BIA before this court's decision in Barajas Romero, whereby the BIA applied its own precedent, matter of CTL, applying the one central reason standard to the burden of proof for persecution based on a particular social group. However, this court made clear that both the plain language and the legislative history of the Section 1231B3 indicates that the appropriate standard is a reason rather than one central reason. And for this very simple reason, this case should be remanded to allow the agency to apply the proper standard. Why should we find that this was a reason? Correct. Oh, yes, Your Honor. You should find that this particular social group, it's a reason because there is ample evidence in the record, as the immigration judge herself indicated in the administrative record, page 65, that the petitioner is likely to be exposed to violent treatment by the gangs and likely clearly complies with a clear probability standard. That's more likely than not. So she made a factual finding concluding that he would be harmed by the gang. She just didn't find that his membership to the party. Isn't your basic argument the fact that if he can't get the drugs or doesn't take the drugs while he's in Guatemala, that because of his not taking the drugs, he'll react in a particular way. And when faced with either contact with gang members or vigilante groups or police, their reaction to his conduct at that point in time will be violent. Correct. That's your argument. That is. If that is your argument, they're not really attacking him on the basis of his mental status. They're attacking on his actions that they see or perceive in front of them at that point in time. So they may not even know that he has any mental problems at all because their reaction will be violent. Isn't that the problem with your position? Well, the issue would be that his reaction may or may not be violent. He may be symptomatic in different ways. He may be talking to himself. He may be do other actions that may trigger these groups. I'm not saying that he would necessarily be violent. I'm saying that their response to his conduct at the time would be violent. But his conduct would only be triggered by the country conditions and the country conditions in Guatemala. The absence of adequate medical care would cause these groups to persecute him because of his mental illness. You have to have so many things. This has to happen. This has to happen. This has to happen before what you're saying will happen. And so it's so attenuated that that's why the IJ said there's not a nexus. And so you have to show, even though maybe it's a possibility, it's got to compel. For you to prevail here, you have to compel. It's got to be compelled. And it seems like there's so many ifs along the way that, like what Judge Wu said, it really doesn't go back to his original problem of his mental state. That is correct. And that would be true if we were talking in a vacuum. But the record completely confirms that he's been hospitalized four times in the United States. He doesn't take his medication, whether or not his parents are with him. So the fact that his parents will go back with him hasn't been able to prevent him. He's been subject to a 51-50. He's been considered a danger to himself and others. If I never get in a car again, I won't die in a car accident. But that doesn't mean that there's a nexus. Right. So it doesn't strike me that you've got, I think the first point you're making in response to the first question, because there's a lot of questions floating right now. But what I hear you saying in response to the first question is there's nothing speculative about thinking that or suspecting that he will continue to behave exactly as he has behaved. There's no speculation. In this country, he's had access to medicine and he's had his parental support and he's still consistently decompensated and had to be hospitalized. Correct. But it would be very speculative to think that anything different or better is going to happen in terms of his health prognosis if he is removed to Guatemala. So I'll give you that, OK? Then the next step is what happens if he acts crazy? And I don't mean to be disrespectful or flip. That's the term used by the expert in this case. If he starts speaking to himself or acting, to use the quote, acting crazy on the street, the expert speculated about how people would respond to him and it's very violent. I have a different question about this record. And I just have a hard time reviewing it. The expert in this case had lots to say, uniquely qualified, and there are dozens of places where the tape is indiscernible. Indiscernible. You can't tell what the man, how he would have finished his sentences and in some instances in very important places in the record. That's right. So what about that? How do we get a recording where we can tell what the evidence was? There is no, I mean, there are two possible ways, I presume. One would be to assign the transcription to a different transcriber. Can I stop you? I know I'm interrupting, but, and forgive me, but was this telephonic testimony? It was. And so you think there is a recording somewhere and the problem is in the transcription? That could be one of the possibilities. Before I used to work at the immigration court, so sometimes we would have this kind of problems as an attorney advisor that the recording wasn't very clear and transcribers would transcribe indiscernible whenever they didn't have a chance to understand it, but that's unlikely to happen. What's... Did you hear, were you there when this person testified? Could you understand what he was saying? I was not there. Okay. Yes. The other option is to remand it to actually get the testimony on the record in person. But we'll hear what the government has to say. I just, I just had a very hard time reading the expert's testimony. Let me ask you a question. The expert, there is a Thomas Bowerman, B-O-E-R-M-A-N, who is an expert on gang violence in Central America. Yes. Your expert, it was Thomas Bowerman, B-O-U-R-M-A-N. Are they the same person or are they different people? They're the same person. Why is their name spelled differently? Because in one case that he argued in front of, I'm sorry, he made a presentation that the case B-O-E-R-M-A-N and here it's B-O-U-R-M-A-N and the government uses the one spelling and you use a different spelling. That's a good question, Your Honor. I'm not sure about the answer, but. But they're the same person. Yes. As far as I know, it's the same person. All right. I'd like to save time for rebuttal. Yes, Your Honor. Hear what the government says. Yes, Your Honor. Thank you. You have three minutes to respond. Morning. Morning. May I please the court? I'm Virginia Gordon for the respondent. And with regard to the nexus question, we hear the government has the same position that it's just so many ifs. And it wasn't speculated to think that he's going to have trouble with or without his medicine. That part of the of the chain doesn't seem to me to be speculative at all. Yes, Your Honor. I would agree that that part that he probably won't get his medicine. I do believe the record bears that out that it will be compensated even with it or with his parents. So so so if he gets to that point where he's symptomatic, is that where you pick up? Yeah, let me stop. There is no evidence that he cannot get the medicine. In fact, in Guatemala. Right. There's no evidence. So there's access to the medicine in Guatemala, supposedly. The record shows that there is access to the medicine. The World Health Organization has a report that is in the record from 2009, which says that 27 percent of the population of Guatemala has access to coverage for psychotropic medications like Mr. Andes Morales. Right. And he's got the medicine here and he's still having these problems. Right. The only point I don't I don't I don't disagree with your statement about what the record shows about access to the medicine in Guatemala. Sure. But if he doesn't have access to the medicine or doesn't take it, his episodes would have to be in front of either a gang member or a policeman, supposedly, if we adopt the view of policemen in Guatemala and vigilantes. But again, their reactions to his situation won't be because of his mental illness, but because of his actions at that time, because he is not taking his medicine. Right. Yes. What is the distinction you're drawing there? And that distinction, if he becomes psychotic and symptomatic, how is that not on account of his? Well, the standard for the nexus generally is that the persecutor knows that you have the in this case, it would be the mental disorder. That's the group he put forward and harms you because of that mental disorder. And so we're where we see the problem in the record is that the the number of it. So if he is acting symptomatic, the gangs may respond to him because they respond violently to anyone they see as defiant or disrespectful. But it wouldn't be because of the evidence. This is the problem I have that this expert testified to the extent I can read all of his sentences, which is really tough. But he very, very clearly talks about if this guy starts acting crazy and talking to himself, that's conduct. I don't think my earlier question was clear. That's the conduct I'm worried about. If somebody's acting obviously like having a psychotic episode. Right. And an expert opines that he believes that there would be a violent reaction. But the rest of the country conditions evidence doesn't show that gangs particularly target people with mental illness. It shows that they target anyone that they think is problematic in some way. So those symptoms may just trigger the gang's response that I don't like how this person is acting. But it's not because we would be getting into, as as counsel said, this mixed motive question, which if the court believed that that was a mixed motive, that it goes beyond the a reason standard, then it would be appropriate to remand for the board to the agency to address in the first instance, whether there's a reason at all. Which they they believe it appears that they do not find it as a reason. But if the court felt that there are mixed motives, there is this problem of he's acting symptomatic. So I see that's a helpful response to me, because then we'd have the Barajas issue. And what you're saying is we're not sure we have the Barajas issues. That's right position. Yes. What about the record? What about this transcript? It's terrible. It is terrible. There is a declaration by Dr. Borman in the records. Whose responsibility is it that the record is terrible? That's the point. We all recognize that it's terrible, but whose responsibility is it up to the government to have cleaned it up? Or are they entitled just to present what they presented to us? Well, when the record came in, it could have been on both sides to sort of look and see the problem with this indiscernible. So if the court felt that because there are so many problems with the indiscernible record, there is the option that Petitioner's counsel could have requested the audio recording of the hearing.  They can request the audio. But as you said, there's a government lawyer on watch, too. Right. And isn't it the court's responsibility to preserve the record? Yes. And so in many cases I have seen, and I didn't see that here, the immigration judge summarizing. So it's possible that when the immigration judge wouldn't have seen the transcript, it only gets to the board. So I didn't see any indication in the brief to the board or from Petitioner's counsel or in the board's decision that they address this problem with the indiscernible ability. But if the court felt that was a problem and we couldn't get a full record, that again would be appropriate to remand and make sure that we can get the full record on what Mr. Borman was saying. I do think that the declaration. Try to get a better transcription of what there is or the solution be to have him come back to testify again. I think it would be a better transcription of what's already been stated. Is that the way it's made? Can you just tell us how it works? Is there a recording somewhere? There is generally a recording. Yes. All of the hearings are recorded. And so long as the technology works. And there's no indication in this record that it didn't because there's a recording. So it's recorded. And I'm not talking about a second bite of the apple as far as we know we could. And he speaks English, right? The expert? Yes. Yes. Yes. So it could be because it was on telephone, something didn't come through well, and maybe the transcriptionist couldn't hear it. So perhaps a better transcription or perhaps being able to listen to the recording would give a clearer view of what he was saying. Well, do you think under Barajas-Romero, the nexus standard for withholding of removal is a protected ground must be a reason rather than a central reason for harm? I mean, do you think it requires, does Barajas-Romero in this case require a remand, do you think? I think in this case, given how the agency interpreted it, the agency does not see that there even was a reason because what the evidence doesn't link together is that gangs or police specifically target people with mental illness. And so those symptomatic behaviors, it's not necessarily that they know he has schizoaffective disorder or that because of that schizoaffective disorder, they're then motivated to harm him. The general evidence, when you look at the weight of it, shows that gangs harm anyone, as I said, who are defiant or disrespectful. So maybe you're doing lawyer speak on me. Does it require, you are a lawyer, so that's okay, but just so that I can drill down on this, is because it was decided on nexus that that's where it broke down, does it need to go back? Do you think it requires a remand under, because Barajas-Romero happened after, right? Right, it did happen after. I would, given the board's position, I don't think it requires a remand, but I do think if the court is concerned about whether the board should address if there's a mixed motive, then it would be appropriate. But I do think under this record, it's going to come out with the same result, it seems, because the board seems to, the agency seems to have decided there's not even, that this mental illness is not even a reason for the harm, it's just he might be harmed possibly, not more likely than not, because he might act in a way that a gang member doesn't like, which could be any. There is, we can't tell the extent to which you'd even address this expert's testimony. That, with the board, the board's. IJ, and the board's reviewing what the IJ did, and I just can't see that this is even addressed, and I can't tell, and that might not matter, depending on what the expert had to say, but there are parts of the expert's testimony that strike me as very concerning, and then these, the indiscernible places, I'm sure you've read, you clearly have read the record, and it's very, very frustrating where those indiscernibles pop in, so. Yes, they do, they are challenging, so with these challenges. But Mr. Borman is not an expert on medical issues, and he does not know, again, what the manifestations are. There isn't anything in the record to indicate how this particular petitioner acts specifically when he doesn't have the medication, and so, therefore, Dr. Borman, because HD, he's a doctor, he can't, he didn't really even testify to that. And he did indicate that he was not testifying as a medical expert. Yes, he did, and I think that's where some of the challenges are in. The expert testimony, coupled with the country conditions evidence, is what the IJ and the board discussed, and although they didn't discuss it in perfect detail, saying, I'm talking about this piece of evidence versus this piece of evidence, the totality of the evidence, when looked at together, doesn't meet that more likely than not standard, that the harm will come because of the mental illness, with all of the what-ifs that are raised in the speculative claim that, like you said, we don't know what behaviors will happen, and we don't know how gangs respond to what behavior they might see. We just know, in general, everyone is at risk of harm in Guatemala because of the way that gangs treat the general public. And I'm looking at expert 168, where Dr. Borman talks about his experience working with mental health populations. You're familiar with that part of the record, so I don't need to read it into the record. What is your response to that? It's a pretty significant experience working with mental health. He does have the experience working with mental health patients. It wasn't clear in the record that he has some symptoms that he's seen people portray, but again, we don't know what Mr. Mendez-Morales specifically would portray. We saw some things before he was hospitalized, some of his behaviors about self-harm or being worried about someone coming after him and him seeking help, but we don't have the evidence from Dr. Borman to say specifically how. Actually, he was institutionalized four times, but the dates of those institutionalizations was ambiguous or inconsistent, because I had thought there was something that said that he was institutionalized, like, in 2007, which would be much earlier than the other testimony later indicating that his institutionalization was at a different point in time. The way I believe it was in the record, Your Honor, is that he was first diagnosed in 2007. They first saw the signs, but that his hospitalizations occurred in December of 2011 and then January, February, and March of 2012, so those were closer together in time, and I see that my time is over, so if there are no further questions, we believe that the NEXUS standard would be met, that there was not a reason, and thank you for your time. Thank you. Just one quick point, respectfully, Judge, there is ample evidence in the record about his symptoms when he's subject to, when he's off his medication, there is page 341 to 357 and page 505 to 561, while he was detained, while he was in ICE's custody, so there is ample evidence of auditory hallucinations, and he talks to himself, and he's threatening to individuals around him, threatening to himself, he has suicidal ideation, and all these kind of symptoms are clearly indicated in the record, and, no problem, and in response to the government's argument that there is not even a reason, there is a conflation of standards here. In this case, there's no need to show there is a specific intention to harm them. We only need to show that there is a reason, that they're motivated, like he may act irrationally, and that's why they weren't acting, but as soon as they realize that he is a mentally ill person, he may be subject to this kind of behavior, and the issue here is not only from the gangs or from the police. There is evidence in the record that 0% of Guatemalan police within the past five years, from 2009, has had any training in mental illness, so they may be completely incapable of dealing with a petitioner like this. In this case, there's a page 449 of the World Health Organization, and he's already been in prison and incarcerated in the United States at least twice, so there's nothing speculative about what could happen to him, and the Department of State Human Rights Report, in the Administrative Record, page 362, clearly talks of... When he was in criminal custody, it wasn't because of anything that had to do with the act of taking medicine. I thought it was the crimes that were charged. It was. Wasn't there a receiving stolen property or something like that? Maybe I'm mistaking this. No, you're correct about that. That's in 2007. He left his parents' house. He was off his medications, and he was acting in a way that wasn't responsible under the circumstances, and he was following this advice from this person that was with him. I mean, that's what the record reflects, but there's indication in the Department of State that there are killings of inmates against other inmates, and there are also information that mental health patients are sometimes kept in hospitals with other inmates because judges just send them there, and that's a page 469. There's evidence of that treatment. Even the experts said that treatment is not targeted, but it is because of a lack of funding, etc., etc., and the lack of funding doesn't necessarily relate to the point that you're trying to make. That is right. The lack of funding, it's not the issue. The consequences of the lack of funding would be that he would be even more exposed than he was in the United States to this kind of mistreatment from various segments of society, and for this reason, this case should be remanded because there is at least a reason, because his membership in a particular social group is at least a reason for a likely persecution, as the immigration judge found. Thank you. Thank you. This matter will stand submitted. The next matter on calendar is Zhaoyang Chen v. William Barr, 15-73269, submitted on the briefs.
judges: Callahan, Christen, Wu